IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Steven C. Briscoe, | ) | |
| | ) | C/A No. 8:15-2536-MBS |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **ORDER AND OPINION** |
| Warden Leroy Cartledge, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

Petitioner Steven C. Briscoe is an inmate in custody of the South Carolina Department of

Corrections. Petitioner currently is housed at Ridgeland Correctional Institution in Ridgeland, South

Carolina. On June 30, 2015, Petitioner filed a petition for a writ of habeas corpus pursuant to 28

U.S.C. § 2254.

## I. FACTS

On July 3, 2003, Petitioner and a friend, Jasson Turner, traveled from Danville, Virginia, to

the Grover area of Dorchester County, South Carolina, for the purpose of selling cocaine to an

acquaintance of Turner's. ECF No. 14-1, 155-62. They traveled to South Carolina in a gold Pontiac

Grand Am belonging to Petitioner's mother. Id. at 162. Petitioner and Turner arrived at Ryan

North's house about 9:00 p.m., and met up with Ryan North; his brother, Travis North; and Anthony

Folk. The group drove to Lanesha Green's house to distribute the cocaine. At the house were

Jermaine Cusack, Mark Cook, Johnny Cobb, Green, and Clay Singleton. Eventually Petitioner and

Turner sat down in a living room area to package the cocaine for sale and count money. Id. at 176;

280, 385. Mark Cook came into the room, snatched one of the bags of cocaine, and tried to run out

the door with it. Id. at 177, 281, 385. Petitioner immediately pulled a gun and shot Cook five times,

killing him.  Id. at 177, 281, 386.

Petitioner was indicted for murder on October 24, 2005.  ECF No. 14-4, 139.

Petitioner, represented by Kevin Kearse, Esquire, appeared before the Honorable Deandra L. Jefferson on October 31, 2005, to pick a jury and proceed to trial.   After the solicitor and counsel for Petitioner made their peremptory strikes, trial counsel raised an issue pursuant to Batson v. Kentucky, 476 U.S. 79 (1986) (holding that racial discrimination in jury selection offends the equal protection clause).   Trial counsel argued that the solicitor had impermissibly stricken a Native American male and a black female.  ECF No. 14-1, 31.  The solicitor stated that he had stricken the Native American male because he lived in a close-knit Native American community in the St. George, South Carolina, area.  According to the solicitor, there had been an unpopular case in that area that could have caused this juror to feel resentment toward the solicitor's office.  The solicitor also asserted that he had stricken the black female because she worked at the Charleston County Detention Center with inmates who have substance abuse issues, and the solicitor could not determine whether she would be favorable or unfavorable to the state's case.   The trial judge ruled:

> The striking party has been allowed to provide its neutral reasons for the strikes that have been exercised.
>
> The court would find that the explanations given are completely plausible, and within the range of what would be contemplated by someone similarly situated striking a jury.  Based on the totality of the facts and circumstances of the record the court would find that the reasons given are not pretextural [sic], nor have they been race – nor have they been motivated by race.  I would find that the explanations given by the solicitor are race neutral and that the defendant in this case has failed to meet his burden of challenging the, these jurors having been seated.  He has not provided any evidence that the explanations given have been pretextural [sic] and that is looking at each individual explanation as well as the totality of the facts and circumstances of this record.  Therefore, the motion is denied.

Id. at 31-34.

The solicitor called as witnesses Green, Turner, Ryan North, Travis North, Folk, and Cusack, all of whom testified to their recollections of the night of July 3, 2003, including Petitioner's presence at the scene; his car with Virginia license plates; the bagging of cocaine in the living room; and the shooting. Id. at 154-211 (Turner); 218-59 (Green); 268-325 (Ryan North); 329-51 (Folk); 354-76 (Cusack); 379-420 (Travis North). Ryan North and Travis North testified that they were able to identify Petitioner from a photographic line-up. Id. at 290-91 (Ryan North); 396-98.

Dr. Joel Steven Sexton, Director of Pathology at Newberry, South Carolina, testified that he examined the body of Cook and determined that he had been shot five times in the right side of his body. Three of the bullets passed through his right upper arm and into his chest. One of the bullets entered the chest cavity and struck Cook's heart and both lungs, and the other two were located in the subcutaneous tissue between the ribs and the skin when they were recovered. A fourth bullet entered his right side near his waist and was recovered from his left leg. A fifth bullet entered Cook's right back and perforated the intestines at the mesentery. ECF No. 14-1, 431, 434.

The solicitor called Earl Vincent Asbell, Jr., a lieutenant at the Dorchester County Sheriff's Office, to the stand. Asbell testified that he arrived at the scene shortly after midnight on the morning of July 4, 2003. He took photographs as he arrived on the premises and as he entered the house. Id. at 458-60. He testified there was a trail of blood leading from the hallway right at the front door leading into a bedroom where a body was lying on the floor to the right. Id. at 460. Asbell noted that there had been blood splatter at the scene, and explained:

> A.    When there's an injury to the body, let's say for instance, a gun shot wound, when the bullet enters the body and as it exits it takes tissue and blood with it. Depending on if it's bare skin, a lot of times you'd have what we call a

3

>    back spatter, which is usually a lot less. When you're dealing with a gun shot
>    wound you're dealing with blood spatter in excess of a hundred feet per
>    second, so usually the blood spatter is less than one millimeter when you're
>    dealing with a gun shot wound, whereas in a beating it would be anywhere
>    from one to three millimeters.

> Q.    Okay. And you've had training in blood spatter analysis?

> A.    My first session with it was in nineteen ninety-two, at I.P.T.M., I was
>    introduced to different patterns at that class, it was a crime scene technician's
>    work shop. Then in nineteen ninety-four I attended basic blood spatter. In
>    nineteen ninety-seven I attended advanced blood spatter course. In the basic
>    class we created our own blood spatter at that time, we had a lift where we
>    dropped it from different heights, we took objects with a sponge on it and
>    hammers, wrenches, just different items, and we beat it, and when we did we
>    had light paper surrounding it so we could see what the pattern was on that.
>    And then, later on that week we went into mock crime scenes. Now, when
>    I went back for the advanced blood spatter course they had mock scenes, we
>    had domestic blood spatter, we had armed robberies with shootings involved,
>    and we worked different crime scenes at that time, learning how
>    to document the blood spatter.

Id. at 465-66.

Asbell went on to describe the blood spatter on the door as some high velocity blood spatter.

Id. at 466-67. Asbell also noted that there was a drop pattern on the floor where the victim had

walked toward the bedroom after he was shot. Id. at 470. Asbell explained:

> A.    When blood is in motion and when it hits the floor, a lot of it depends on the
>    texture of the surface. If you had a smooth surface it would be a lot more
>    rounder and a lot more smoother, but there was some, this floor was not
>    exactly really smooth, but the satellite spatter is what we call when blood hits
>    in the direction that it's going it cases off little satellite spatters, and it shows
>    the direction in which the blood is traveling.

> Q.    And which direction was that in this case?

> A.    It was going from the front door into the bedroom where the body was.

> Q.    Okay. And how was that blood – where was that blood coming from?

4

> A.    I would assume it was coming from the wound on the deceased as he was
>        walking into the bedroom there.
>
> Q.    As if he's dripping blood —
>
> A.    Yes, sir.
>
> Q.    — going in there?
>
> A.    Yes, it's not, it wasn't being case off or anything, it was just dripping straight
>        down as he was walking in.

Id. at 471-72.

Vello Paavel of the South Carolina Law Enforcement Division testified regarding his analysis of the bullets recovered from the scene of the shooting. Paavel determined that the bullets were consistent with bullets found in ten millimeter automatic, or forty Smith and Wesson caliber cartridges. Id. at 499. Paavel testified that the bullets were most likely fired from a Glock. Id. at 500-01. William Henry Chaney of the Danville, Virginia Police Department testified that on January 7, 2003, he had contact with Petitioner with respect to an accidental discharge of a Glock ten millimeter handgun. ECF No. 14-2, 152. Mark Kelly of the Bureau of Alcohol, Tobacco, Firearms, and Explosives in the Charleston, South Carolina, field office testified that the Glock that had been in Petitioner's possession in Danville had been sold in 2001 to Helen Coles, Petitioner's mother. Id. at 167.

Helen Briscoe Cole testified that she had purchased the Glock for protection because at the time she was working at night. Id. at 202. She testified that she had turned the weapon over to Petitioner in January 2003 for him to clean it. Id. at 204. Cole stated that she retrieved the Glock after Petitioner accidentally discharged it, and that she subsequently used it as collateral for a loan. Id. at 204-05. According to Cole, the weapon was never returned to her. Id. at 205. Cole testified

5

that she owned a 2001 Pontiac Grand Am, but that she did not allow Petitioner to drive it. Id. at 206-08. Cole testified that she had driven her vehicle to the Salem State Fair in Roanoke, Virginia, the evening of July 3, 2003. Id. at 209.

On cross-examination, Cole stated she recalled a meeting with detectives from South Carolina. Id. at 214. Cole stated that she had told one of the detective, Detective Van Doran, that she had a gun that was stolen out of a Mazda that had been wrecked some years before. Id. at 215. Cole testified:

Q.  You don't deny that?

A.  No, I don't.

Q.  And now you're telling us you gave a gun to Mr. Wilson?

A.  We're talking about two different guns here.

Q.  And they were talking about one gun at that point, and he was asking you about a gun that you own?

A.  The one he asked me about I gave him the correct answer, yes, I did.

Q.  But you didn't tell him at that time that you gave it to James Wilson, did you?

A.  Because that's not what he asked me, he asked me did I own one, I said, yes, that was stolen out of my car.

Q.  He asked you did you own a gun, is that correct?

A.  Yes, he did.

Q.  And the gun that you told him about, you said was stolen out of the car?

A.  Yes.

Q.  Did you tell him you owned two guns?

A.  No, because that's not what he asked me.

6

Q.    Well, what did he ask you?

A.    Did I have a gun that was taken, and I said, yes, I did.

Q.    He didn't ask you if you knew about a gun?

A.    No – yes, he did – yes, he did, I'm sorry, yes he did.

Q.    And you said it was stolen?

A.    One was stolen out of my Mazda.

Q.    One was stolen?

A.    Yes, that's exactly what I said to him.

Id. at 215-17.

The solicitor proposed to place Terrance A. Van Doran of the Dorchester County Sheriff's Office on the stand to testify in rebuttal to Cole regarding the weapon at issue.  ECF No. 14-3, 124. Van Doran recorded Cole's statement using a voice-activated recorder that he had placed in his front shirt pocket.  Id. at 130-31.  The trial judge heard the recording outside of the jury.  Trial counsel objected to the surreptitious nature of the tape recording, but asserted no objection to its contents. The trial judge stated:

> . . . I am a little troubled that surreptitiously she was taped also.  What I need to determine is, if was truly impeachment, and also to determine if it was cumulative. How it was recorded I'm not certain would necessarily would have been an issue the court would have considered, except as it would relate to –  I think the issues that would have come into play with that may have been weight issues.  And clearly, just so the record is clear, this was not a telephone conversation, as I understand it, the officer, after consultation with Mr. Bell, Mr. Bell advised that he had, I would assume, a voice activated recorder in the pocket of his shirt which recorded these proceedings.
>
> So, there really are no wire tap issues.  But as I indicated earlier, there's a South Carolina case on point that says, even if you tape someone and they're not aware of it, it's allowable for impeachment purposes, and if the federal government

wants to prosecute you that's up to them.  But as far as impeachment it would have been admissible.

But nevertheless, the issue is moot because [trial counsel] has withdrawn his objection.

Id. at 105.

The state introduced portions of the tape recording of Van Doren's conversation with Cole in which Cole claimed her weapon had been lost after she had been in a car accident.  Id. at 128-30. On cross-examination, trial counsel noted that Cole had stated during the interview that she did not recognize the type of weapon Van Doren was wearing, which was a Glock.  Id. at 130.  Trial counsel queried Van Doren:

> Q.    Alright.  So, then she told you about the gun that she lost in her car, is that correct?
>
> A.    That's correct, sir.
>
> Q.    And it's conceivable, since she said, no, it doesn't look like that Glock you showed her, she was talking about another hand gun, correct?
>
> A.    That was not my understanding, sir.
>
> Q.    Alright. Now, you – and she was consistent, I mean, she told you, I got in a car accident, I got hit from the rear and so on?
>
> A.    Absolutely, yes, sir.
>
> Q.    Now, you tape[] recorded this conversation, correct?
>
> A.    Yes, sir.
>
> . . . .
>
> Q.    But you did not inform this woman when you questioned her that you were taping her?
>
> A.    No, sir.

8

> Q. Alright, so, and you asked her these questions unbeknownst to her that she was being recorded, correct?
>
> A. That's correct, sir.
>
> . . . .
>
> Q. Alright. And you told her, when you went in there and you announced to her what situation her son was in, it was the first time she had heard, that you know of, he was being charged with murder, correct?
>
> A. It appeared that way.

Id. at 130-32.

Next. Petitioner took the stand. Petitioner testified that he was in Danville, Virginia, on July 3, 2003, with his girlfriend. Petitioner testified that the last time he had seen Turner was in May 2003. Petitioner denied seeing Turner in July of 2003, being in South Carolina the evening of the murder, and having any reason to go to South Carolina. ECF No. 14-2, 235. Petitioner denied ever having met Ryan North, Travis North, Jermaine Cusak, or Anthony Folk. Id. at 235-36.

Petitioner also testified that his mother's Glock had misfired while he was cleaning it, and stated that he returned it to her the same day. Id. at 236-37. Petitioner testified that when he saw Turner in May 2003, Turner had a weapon "exactly like" Cole's Glock in the waistband of his pants. Id. at 240, 251. Petitioner stated he did not kill Mark Cook: "This man could walk up to me and smack me in the face, I would not know who he is. I've never seen any of these people dealing with this case ever in my life except for Jasson Turner." Id. at 249.

During closing arguments, trial counsel argued, among other things, that Turner came to South Carolina regularly to deal drugs. Id. at 142. Trial counsel asserted that the state's witnesses concocted the story to implicate Petitioner, and supported this version of the facts with discrepancies in the statements of the state's witnesses as given to law enforcement and compared to their trial

9

testimony.  Trial counsel noted the state's witnesses were drug dealers who carried guns.  Id. at 158-59.

The solicitor argued, among other things:

But here's the interesting part, what the defense wants you to believe is that Jasson Turner, Ryan North, Travis North, Anthony Folk, everybody, Jermaine Cusack all got together, talked this thing over, and made up the story to frame Steven Briscoe. Well, the defense can't have its cake and can't eat it at the same time.  The stores are different.  Jasson Turner's rendition of the facts are different from Ryan North's, slightly different from Travis North's, slightly different from Anthony Folk's and Lanesha Green's, number one, from the simple fact is that we, as humans,, all perceive things differently.  We remember things differently.  I challenge you, when you go back to your jury room and deliberate, each of you will remember things a little different and have to make sure that what was done is right.  That's just, that's basic human nature.  But the flip side of that, ladies and gentlemen is, if their stories had been exactly the same down the line, agreed on every point, then they got together and made up the story.  And you don't have this in this, the stories are different. . . . But don't you think if, if they were getting together to set up Steven Briscoe, if Jasson Turner wanted to set up his buddy, they would have gotten this tight, air tight, you know, you can't say they differentiate, on one hand, and then say they made up something on the other hand, when they don't really – they don't match up well.  They match up enough, the basic line of what happened is current through the story.  But they came in [and] tried to tell the truth as best they remembered it.  You got to see everybody on the stand, and how they reacted.   Because I guarantee you — . . . Don't you think they would have gotten their stories straight?  Or are they just telling the truth?  And I'll tell you, ladies and gentlemen, they're just telling the truth as best they can, with their self-preservation modes going on, with their being scared of what happened that night. . . .

ECF No. 14-3, 189-91.

On November 4, 2005, the jury found Petitioner guilty of murder.  Id. at 231.  The trial judge

sentenced Petitioner to incarceration for a period of thirty years.  ECF No. 14-4, 9.

Petitioner timely appealed his conviction.  He was represented on appeal by the South

Carolina Commission on Indigent Defense.  Petitioner raised the following sole issue:

The trial judge committed reversible error by denying defense counsel's motion under *Batson v. Kentucky* to quash the jury on the ground that the Assistant Solicitor had invidiously discriminated against both Native and African-Americans in his use

of peremptory challenges.

ECF No. 14-6, 4.

The South Carolina Court of Appeals affirmed the trial judge by unpublished opinion filed May 14, 2008.  ECF No. 14-8.  The remittitur was issued on May 30, 2008.  ECF No. 14-9. Petitioner thereafter filed an application for post-conviction relief (PCR) on or about April 18, 2009, as amended on January 19, 2010.  Petitioner raised the following grounds for relief:

A.    Was counsel ineffective for failing to object to the highly prejudicial opinion testimony of a State's witness who had not been qualified as an expert by the trial court?

B.    Was counsel ineffective for failing to object to the prosecution's prejudicial closing argument that unduly prejudiced petitioner and denied him of a fair trial?

C.    Was counsel ineffective for failing to object to the prosecution's improper closing argument that violated the golden rule?

D.    Was counsel ineffective for failing to object to the highly prejudicial closing argument by the State that impermissibly vouched for the State's witnesses and bolstered the credibility of the State's case?

E.    Was counsel was ineffective for failing to object to the trial court's jury instructions that shifted the burden of proof?

F.    Was Petitioner denied his right to a fair trial when counsel failed to object to the erroneous jury instructions on malice?

ECF No. 14-4, 10; 14-10, 5.

On May 22, 2013, a PCR hearing was held before the Honorable Edgar W. Dickson. Petitioner was represented by Charles T. Brooks, III.  Petitioner first testified regarding Issues A and B.  Petitioner asserted that trial counsel was ineffective for failing to object to Asbell's blood spatter testimony, even though Asbell had not been qualified as an expert in blood spatter analysis.  Id. at 38.  Petitioner contended that the testimony was prejudicial because the spatter was not tested to

determine if it was, in fact, blood, and because the crime scene had been compromised by the individuals present when the shooting took place. Id. at 49. Petitioner withdrew Issue C. Id. at 50. Regarding Issue D, Petitioner contended that the State's case was based "solely on self-supportive, biased, alleged eyewitness testimony by witnesses who were directly involved with the incident, two of whom which were even facing prison themselves because of it. They all gave conflicting, contradictory stories." Id. Petitioner asserted that the solicitor impermissibly gave his personal assurance as to the veracity of the State's witnesses. Id. at 53.

Petitioner withdrew Issues E and F. Id. at 62. Petitioner next raised Issue G, which had not been asserted in the filings before the PCR judge. Id. at 63. Petitioner argued that trial counsel was ineffective for failing to object when the State impeached Cole's testimony with an allegedly illegally recorded tape conversation. Id. Petitioner asserted that the solicitor further misled the jury by using the recording to disparage Cole's testimony. Id. at 74. Petitioner argued that Cole's testimony was not unreliable, because she had been talking about two different guns; one missing after a car wreck, and the Glock she purportedly used for collateral. Id. at 78. Petitioner stated that after the trial his mother obtained receipts for a Glock purchased in 2001 and a Jennings purchased in 1999. See id. at 120, 122 (sales receipts). Petitioner contended that, had he known about the tape recording, he would have been able to provide the 1999 sales receipt to rebut Van Doren's testimony.

Trial counsel testified at Petitioner's PCR hearing. Trial counsel admitted that he possibly should have objected to the blood splatter testimony offered by Asbell, but stated that he did not believe the blood splatter evidence was outcome determinative because the defense argument was that Petitioner had an alibi. Id. at 106. Trial counsel observed that there was no evidence to show that Petitioner had been in the house or had shot the victim. Id. Trial counsel agreed that he should

have objected to the solicitor's closing argument as improper vouching for the credibility of the

state's witnesses.  <u>Id.</u> at 107.  Trial counsel stated:

> A.     No, what he said in his closing, he said something about, I don't know if he
> said, I guarantee they're telling the truth or, but he did vouch.  He started vouching
> for their credibility.  I mean, to be quite honest, you know, I should have objected but
> at trial it came across as begging, to be honest, because their witnesses were, lacked
> so much credibility.  It just was – it almost came across as a plea of desperation, if
> you ask me, you know.

<u>Id.</u>

Trial counsel noted that he had unsuccessfully moved to suppress the out-of-court

identification by Ryan North and Travis North as well as the tape recording of Petitioner's mother.

<u>Id.</u> at 111.  Regarding the tape recording, trial counsel testified:

> A.     The issue of, that he brought up about the tape.  I objected to the tape prior
> to the tape being played.  And he's right, I haven't even heard the tape.  It
> hadn't been turned over pursuant to discovery.  I objected on that grounds.  I
> also objected on the fact that he was surreptitiously tape recording in terms
> of the mother.  Judge Jefferson chose to allow it and said that they did not
> have to turn it over or supply it to us because they were using it in rebuttal for
> impeachment purposes.

<u>Id.</u>

On August 19, 2014, the PCR judge issued an order in which he found trial counsel's

testimony to be more credible than Petitioner's testimony.  The PCR judge determined that Petitioner

failed to show that counsel was ineffective in any respect.  As to Asbell's testimony, the PCR judge

determined:

> Applicant failed to meet his burden to prove counsel was ineffective for
> failing to object to allegedly improper opinion testimony from Lt. Asbell regarding
> his investigation of the crime scene.  "The expertise, reliability, and the ability of the
> testimony to assist the trier of fact are all threshold determinations to be made prior
> to the admission of expert testimony, and generally, a witness's expert status will be
> determined prior to determining the reliability of the testimony."  <u>State v. Tapp</u>,
> 39S.C. 376, 388, 728 S.E.2d 468, 474-75 (2012).  Lt. Asbell testified to his

investigation of the crime scene. Applicant claimed this witness' testimony regarding "blood splatter" was inadmissible because the solicitor did not move to qualify him as an expert. Applicant posited that the splatter might not have even been the victim's blood. Counsel testified at the PCR hearing that Lt. Asbell was qualified to testify on the matter. Counsel testified that he was aware of Lt. Asbell's experience and training at the South Carolina Criminal Justice Academy. This Court agrees with counsel's assessment where the record shows that the witness had fourteen years of experience in crime scene investigation and over twelve years of continued training in blood splatter analysis. . . .

Furthermore, this court agrees with counsel that the allegedly improper opinion testimony was inconsequential to Applicant's case. Here, Applicant claimed an alibi defense. Thus, the identification of blood splatter was immaterial in the context of defense theory of the case. Again, counsel demonstrated effective performance in cross-examining the State's witnesses in eliciting testimony that there was no forensic evidence that placed Applicant at the scene. . . . Therefore, this allegation is denied and dismissed.

ECF No. 14-4, 130-31.

Regarding Petitioner's claim of improper vouching by the solicitor, the PCR judge held, in

part:

Applicant failed to meet his burden to prove counsel was ineffective for failing to object to various alleged improper comments made by the solicitor during [the] State's closing argument. "[S]olicitor's closing argument must be carefully tailored, so as not to appeal to the personal biases of the jury." State v. Copeland, 321 S.C. 318, 324, 468 S.E.2d 620, 624 (1996). The State's closing arguments must be confined to evidence in the record and the reasonable inferences that may be drawn from the evidence. Id. "A solicitor has a right to state his version of the testimony and to comment on the weight to be given such testimony. Randall v. State, 356 S.E. 639, 642, 591 S.E.2d 608, 610 (2004). However, "[s]olicitors are bound to rules of fairness in their closing arguments." State v. Northcuff, 372 S.C. 207, 222, 641 S.E.2d 873, 881 (2007). "Improper comments do not automatically require reversal if they are not prejudicial to the defendant, and the appellant has the burden of proving he did not receive a fair trial because of the alleged improper argument." Humphries v. State, 351 S.C. 362, 373, 570 S.E.2d 160, 166 (2002). "The relevant question is whether the solicitor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." Id.

. . . .

The solicitor's comment that the eye-witnesses testified to the best of [] their

recollection did not constitute vouching.  First, the record shows the eye-witnesses had been drinking alcohol and smoking marijuana at the time of the offense.  Second, the eye-witnesses took an oath to testify truthfully.  (Trial Tr. p. 939).  Regardless, this Court finds counsel offered  a valid trial strategy for not objecting. Counsel stated that the solicitor's comments on inconsistent testimony from his witnesses accentuated Applicant's case.  In addition, counsel testified that [the] solicitor's comments here placed him in a bad light in front of the jury.  Therefore, this allegation is denied and dismissed. . . .

ECF No. 14-4, 123-37; ECF No. 14-12.

Regarding the tape recorded conversation utilized to impeach Cole, the PCR judge determined:

Applicant failed to meet his burden to prove counsel was ineffective for failing to object to the admissibility of Det. Van Doran's audio recording of an interview with Coles as extrinsic impeachment evidence.

Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is advised of the substance of the statement, the time and place it was allegedly made, and the person to whom it was made, and is given the opportunity to explain or deny the statement. If a witness does not admit that he has made the prior inconsistent statement, extrinsic evidence of such statement is admissible.

State v. McLeod, 362 S.C. 73, 80-81, 606 S.E.2d 215, 219 (Ct. App. 2004) (citing Rule 613(b), SCRE). "Generally, where the witness has responded with anything less than an unequivocal admission, trial courts have been granted wide latitude to allow extrinsic evidence proving the statement." State v. Carmack, 388 S.C. 190, 201, 694 S.E.2d 224, 229-30 (Ct. App. 2010).  This Court finds Applicant failed to present credible evidence or justification that the audio recording in question constituted inadmissible extrinsic evidence.  During the defense['s] case-in-chief, Coles testified she owned a .10 mm Glock handgun that Applicant accidentally discharged from the January 2003 incident. (Trial Tr. p.700).  She testified she transferred possession of the gun to her former lover, Wilson, prior to July of 2003 as collateral on a personal loan.  When cross-examined on why she told Det. Van Doran a different story on the matter, she testified that she mistakenly disclosed information on a different handgun. She posited that Det. Van Doran did not specifically inquire about the .10 mm Glock handgun in question. Thus, the State presented an audio recording of Det. Van Doran's interview in its rebuttal case.  This Court finds an objection to its admissibility lacked merit.  Therefore, this allegation is denied and dismissed.

****\*\*\*\*\*\*****

      Applicant's allegation that counsel was ineffective for failing to make a suppression argument on the matter and object to the admission of the audio tape based on alleged violation of the Federal Wire Tap Act is similarly without merit. Applicant has no standing to assert privacy interest of a third party witness. See State v. Crane, 296 S.C. 336, 340, 372 S.E.2d 587, 589 (1988) ("In order to have evidence suppressed on constitutional grounds, appellant ['] must establish that his own Fourth Amendment rights were violated.[']"). Regardless, Applicant's testimony on the matter was illogical. See State v. Whitner, 399 S.C. 547, 565, 732 S.E.2d 861, 870 (2012) ("[O]ne party to a protected communication has no expectation of privacy under the Wiretap Act if the other party consents to recording or disclosure."). Therefore, this allegation is denied and dismissed.

Id. at 29-30.

      PCR counsel filed a notice of appeal from the PCR judge's order on or about September 5, 2014. The South Carolina Commission on Indigent Defense filed a Johnson[1] petition for writ of certiorari on or about November 24, 2014, raising the following sole issue:

      Whether trial counsel was ineffective in failing to object to those portions of the assistant solicitor's closing argument vouching for the credibility of the State's witnesses?

ECF No. 14-13.

      Petitioner filed a pro se petition for writ of certiorari on or about February 25, 2015, in which he asserted the following issues:

      Trial counsel was ineffective for failing to object to the highly prejudicial opinion testimony of a State's witness who had not been qualified as an expert by the Trial Court.

      Trial counsel was ineffective for failing to object to the prosecution's prejudicial closing argument that unduly prejuced Petitioner and denied him a fair trial.

      Trial counsel was ineffective for failing to object to the highly prejudicial closing argument by the State that impermissibly vouched for the State's witnesses and

---

[1] Johnson v. State, 364 S.E.2d 201 (S.C. 1988).

bolstered the credibility of the State's case.

Trial counsel was ineffective for failing to object when the State impeached a defense witness's testimony with an illegally recorded taped conversation.

ECF No. 14-14.

The South Carolina Supreme Court denied the petition for writ of certiorari by order issued

April 8, 2015. ECF No. 14-15. Remittitur was issued on April 24, 2015. ECF No. 14-16.

Petitioner raises the following grounds for relief in his § 2255 motion:

### Issue I

The actual innocence claim of Petitioner in Lower Court's decision was contrary to well established law.

### Issue II

The Lower Court's decision was contrary to well-established Federal Law as defined in the mandates set forth in <u>Batson v. Kentucky</u>.

### Issue III(A)

The Lower Court's Decision was contrary to well-established Federal Law in trial counsel's failure to object to the highly prejudicial opinion testimony of a State's witness who had not been qualified as an expert by the trial court.

### Issue III(B)

The Lower Court's decision was contrary to well-established Federal Law in trial counsel's failure to object to the prosecutor's prejudicial closing argument that unduly prejudiced Petitioner and denied him a fair trial.

### Issue IV

The Lower Court's decision was contrary to well-established Federal Law in trial counsel's failure to object to the highly prejudicial closing argument by the State that impermissibly vouched for the State's witnesses and bolstered the credibility of the State's case.

### Issue V

The Lower Court's decision was contrary to well-established Federal Law in trial counsel's failure to object when the State impeached a defense witness' testimony with an illegally recorded taped conversation.

ECF No. 1-1, 4-5.

In accordance with 28 U.S.C. § 636(b) and Local Rule 73.02, D.S.C., this matter was referred to United States Magistrate Judge Jacquelyn D. Austin for pretrial handling. The petition is governed by the terms of 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), which became effective on April 24, 1996.

On October 1, 2015, Respondent Warden Leroy Cartledge filed a return and memorandum and motion for summary judgment. By order filed October 2, 2015, pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), the Magistrate Judge advised Petitioner of the summary judgment procedures and the possible consequences if he failed to respond adequately. Petitioner filed a response to Respondent's motion on November 23, 2015.

On July 25, 2016, the Magistrate Judge issued a Report and Recommendation in which she determined that Respondent's motion for summary judgment should be granted. Petitioner filed objections to the Report and Recommendation on September 12, 2016. Respondent filed a response in opposition to Petitioner's objections on September 29, 2016.

The Magistrate Judge makes only a recommendation to this court. The recommendation has no presumptive weight. The responsibility for making a final determination remains with this court. Mathews v. Weber, 423 U.S. 261, 270 (1976). This court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. 28 U.S.C. § 636(b)(1). This court may also receive further evidence or recommit the matter to the Magistrate Judge with instructions. Id.

18

## II. DISCUSSION

A writ of habeas corpus shall not be granted for any claim that was adjudicated on the merits in a state court proceeding unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The limited scope of federal review of a state petitioner's habeas claims is grounded in fundamental notions of state sovereignty. Richardson v. Branker, 558 F.3d 128, 138 (4th Cir. 2012) (citing Harrington v. Richter, 562 U.S. 86, 103 (2011)). When a federal court adjudicates a habeas corpus petition brought by a state prisoner, that adjudication constitutes an intrusion on state sovereignty. Id. (citing Harrington, 562 U.S. at 103). A federal court's power to issue a writ is limited to exceptional circumstances, thereby helping to ensure that "'state proceedings are the central process, not just a preliminary step for a later federal habeas proceeding.'" Id. (citing Harrington, 562 U.S. at 103). The restrictive standard of review "'further[s] the principles of comity, finality, and federalism.'" Id. (citing Williams v. Taylor, 529 U.S. 362, 364 (2000)). "'The pivotal question is whether the state court's application of the [applicable federal legal] standard was unreasonable.'" Id. (quoting Harrington, 562 U.S. at 103). So long as fairminded jurists could disagree on the correctness of a state court's decision, a state court's adjudication that a habeas claim fails on its merits cannot be overturned by a federal court. Id. (citing Harrington, 562 U.S. at 102).

Law/Analysis

A.　　Claim of Actual Innocence (Issue I)

　　　　The Magistrate Judge noted that freestanding claims of actual innocence typically do not serve as an independent basis for habeas relief, but even if a free-standing actual innocence claim were cognizable on federal habeas review, Petitioner did not set forth any new evidence to show he is actually innocent of the crime of murder.  Petitioner did not object to the Magistrate Judge's recommendation that summary judgment be granted as to Issue I.  In the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."  Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005).  The court finds no clear error.

B.　　Batson Violation (Issue II)

　　　　The Magistrate Judge noted that the trial judge held an in camera hearing after jury selection and addressed Petitioner's Batson motion regarding the solicitor's decision to strike a Native American male and a black female; that the trial judge found the solicitor's articulated reasons for striking these two jurors were race-neutral; and that the South Carolina Court of Appeals affirmed the trial judge's ruling.  Petitioner contends the Magistrate Judge erred in determining that the state courts' decisions were not contrary to, or did not involve an unreasonable application of clearly established federal precedent.  The court disagrees.

　　　　Under Batson, "'[f]irst, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful

20

discrimination.'"  <u>Foster v. Chatman</u>, 136 S. Ct. 1737, 1747 (2016) (quoting <u>Snyder v. Louisiana</u>, 552 U.S. 472, 748 (2008).   In this case, the trial judge considered the totality of the circumstances and properly applied applicable federal law.  The court concludes that the decision of the trial judge, as affirmed by the court of appeals, was not contrary to or an unreasonable application of federal law. Petitioner's objection is without merit.

C.     <u>Ineffective Assistance of Counsel - Blood Spatter</u> (Issue III)

To prevail on a claim of ineffective assistance of counsel, a petitioner ordinarily must satisfy both parts of the two-part test set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  The petitioner first must show that counsel's representation fell below an objective standard of reasonableness.  <u>Id.</u> at 687–88.  In making this determination, a court considering a habeas corpus petition "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>Id.</u> at 689.  However, an error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.   <u>Id.</u> at 691-92 (citing <u>United States v. Morrison</u>, 449 U.S. 361, 364–65 (1981)).  "The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding.  Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." <u>Id.</u> at 692.

The Magistrate Judge determined that the record supports the PCR judge's decision that trial counsel was not ineffective for failing to object to Asbell's testimony, and that, in any event, Petitioner was not prejudiced because he asserted an alibi defense.  Petitioner contends that the Magistrate Judge erred in so finding.  According to Petitioner, the testimony regarding the blood

21

spatter was unreliable and misled the jury into reaching an unfair verdict.  The court disagrees.

Assuming for purposes of summary judgment that trial counsel was ineffective for failing to object to Asbell's testimony regarding the blood spatter found near the victim's body, Petitioner cannot show prejudice.  As the PCR judge observed, Petitioner testified that he was not in South Carolina at the time of the murder.  Asbell's testimony had no effect on Petitioner's alibi defense.  The court concludes that the decision of the PCR judge, as affirmed by the supreme court, was not contrary to or an unreasonable application of federal law.  Petitioner's objection is without merit.

D.    Ineffective Assistance of Counsel - Vouching (Issue IV)

The Magistrate Judge determined that Petitioner failed to show the challenged remarks deprived him of a fair trail.  The Magistrate Judge noted that trial counsel vigorously attacked the credibility of the state's witnesses on cross examination and during closing arguments.  Petitioner contends the Magistrate Judge erred in not finding trial counsel's performance to be deficient.  According to Petitioner, the solicitor's argument bolstered the credibility of the state's case.

The court concurs with the Magistrate Judge's assessment that, assuming for purposes of summary judgment trial counsel was ineffective for not objecting to the solicitor's remarks, Petitioner fails to show prejudice.  As the PCR judge found, trial counsel articulated a valid strategy in that the solicitor's remarks emphasized the unreliability of the statements from witnesses who had been present at the time of the murder.  The decision of the PCR judge, as affirmed by the supreme court, was not contrary to or an unreasonable application of federal law.  Petitioner's objection is without merit.

E.    Tape Recording of Interview (Issue V)

The Magistrate Judge, considering the broad discretion given to trial judges under applicable

law to determine issues such as the admission or exclusion of extrinsic evidence for use in impeaching witnesses, found that the PCR judge properly rules trial counsel was not ineffective for failing to object to the tape recording of Cole's interview. The Magistrate Judge further found no fault in the PCR judge's determination that Petitioner lacks standing to assert any Fourth Amendment violation in connection with the record. Petitioner contends, however, that the rebuttal testimony was improper and that the solicitor intentionally misrepresented the facts to make it seem to the jury that Cole was dishonest.

In federal habeas actions, the court does not sit to review the admissibility of evidence under state law unless erroneous evidentiary rulings were so extreme as to result in a denial of a constitutionally fair proceeding. Burket v. Angelone, 208 F.3d 172, 186 (4th Cir. 2000) (citing cases). The court agrees with the Magistrate Judge's deference to the trial judge's discretion. Further, the court finds that the trial judge's ruling was neither erroneous nor extreme. Morever, trial counsel thoroughly cross-examined Van Doran regarding the fact that he had recorded Cole without her permission or knowledge, as well as a plausible explanation for Cole's statements. The decision of the PCR judge, as affirmed by the supreme court, was not contrary to or an unreasonable application of federal law. Petitioner's objection is without merit.

## III. CONCLUSION

For the reasons stated, Respondent's motion for summary judgment (ECF No. 15) is **granted**. Petitioner's § 2254 petition is **denied and dismissed, with prejudice**.

## IV. CERTIFICATE OF APPEALABILITY

A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A prisoner satisfies this standard by demonstrating

that reasonable jurists would find that any assessment of the constitutional claims by the district court is debatable or wrong and that any dispositive procedural ruling by the district court is likewise debatable.  Miller-El v. Cockrell, 537 U.S. 322, 336-38 (2003); Rose v. Lee, 252 F.3d 676, 683-84 (4th Cir. 2001).  The court concludes that Petitioner has not made the requisite showing.

**IT IS SO ORDERED**.


/s/ Margaret B. Seymour
Senior United States District Judge

Columbia, South Carolina

October 31, 2016


**NOTICE OF RIGHT TO APPEAL**
**Petitioner is hereby notified of the right to appeal this order pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure.**